Filed 9/15/15  P. v. Miller CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. KYLE CHRISTOPHER MILLER et al., Defendants and Appellants. | D067451 (Super. Ct. No. SWF1101646) |

APPEALS from a judgment of the Superior Court of Riverside County, Angel M. Bermudez, Judge.  Affirmed in part; reversed in part with directions.

Eric S. Multhaup, under appointment by the Court of Appeal, for Defendant and Appellant Kyle Christopher Miller.

Marleigh A. Kopas, under appointment by the Court of Appeal, for Defendant and Appellant Patty Ann Lamoureux.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Heather M. Clark, Deputy Attorneys General, for Plaintiff and Respondent.

In the early morning hours of July 6, 2011, Kyle Christopher Miller robbed and killed his uncle, Bradley Capen. The crime occurred in the converted barn Bradley lived in with Kyle's two younger brothers, Kevin and Kurt Miller.[1] The barn was adjacent to the house where Kyle's mother Connie Capen, sister Danielle Miller, and Danielle's boyfriend and young daughter lived. Until just weeks before the murder, Kyle also lived in the barn with Bradley, Kevin and Kurt. After Bradley accused Kyle of stealing, however, Kyle left the family property and moved to the home his friend Patty Ann Lamoureux shared with her boyfriend, Ian Inserra, and Inserra's young son Spencer.

Kyle was arrested the day after the crime was committed. After the discovery of a map of the barn suggesting a plan to rob Bradley and other incriminating evidence, Lamoureux and Inserra were also taken into custody. Eventually the three defendants were jointly charged with felony murder and conspiracy to commit robbery or burglary. All three pleaded not guilty. Lamoureux moved for a separate trial or, alternatively, for a separate jury. The prosecutor opposed the motion and the trial court denied Lamoureux's request. The trial court instead ruled all three defendants would be tried together and that Inserra would have a separate jury. This procedure allowed Inserra's statement to police, which incriminated both Inserra and Kyle, to be introduced against Inserra without compromising Kyle's right to confront witnesses against him under the Sixth Amendment to the United States Constitution.

---

[1] To avoid confusion, we will use first names for individuals who share the same last name.

2

At the conclusion of the trial, Kyle and Lamoureux were convicted of felony murder (Pen. Code, § 187, subd. (a))[2] and conspiracy to commit robbery (§ 182). Kyle was additionally found guilty of illegal possession of a firearm (former § 12021, subd. (a)(1)). The jury also found true special circumstance allegations that the murder was committed while Lamoureux and Kyle were engaged in the commission of the crimes of robbery and burglary (§§ 190.2, subd. (a)(17), 211, 459) and that Kyle personally and intentionally discharged a firearm causing death (former § 12022.53, subd. (d), § 1192.7, subd. (c)(8)). Lamoureux was sentenced to life without the possibility of parole, and Kyle was sentenced to a determinate term of three years in prison and an indeterminate term of life without the possibility of parole. The court imposed restitution fines against both defendants and a crime prevention fine against Lamoureux. Inserra's jury was not able to reach a verdict and the court declared a mistrial. Inserra was acquitted in a subsequent trial.

On appeal, Lamoureux contends she should not have been tried with Kyle, or at minimum she should have been provided a separate jury. She also argues there was insufficient evidence to support her convictions, that the trial court improperly denied her motion for a new trial, and that the sentence of life without the possibility of parole constitutes cruel and unusual punishment. Additionally, Lamoureux challenges the restitution and crime prevention fines imposed against her. We reject Lamoureux's arguments concerning the sufficiency of the evidence to support the felony murder and conspiracy convictions and her severance argument, but agree there was insufficient

---

2       All further statutory references are to the Penal Code unless otherwise noted.

3

evidence to support the jury's finding that she was a major participant in the crime as required for the special circumstance allegation under section 190.2, subdivisions (a)(17), (c) and (d). Because we reverse the special circumstance finding, Lamoureux's arguments concerning cruel and unusual punishment are moot. We agree with Lamoureux, and the Attorney General concedes, that the court erred in the imposition of the crime prevention fine. In addition, on remand we direct the trial court to reevaluate the restitution fee assessed against Lamoureux.

In his appeal, Miller contends he was deprived of a fair trial by the admission of incriminating hearsay statements by his codefendants and challenges the exclusion of certain evidence showing his love and affection towards Bradley. We reject these contentions.

## FACTUAL AND PROCEDURAL BACKGROUND

### I

### *The People's Case*

At the time of his murder, Bradley was living in a converted barn adjacent to the house occupied by his sister, Connie, Connie's daughter Danielle (Kyle's sister), Danielle's boyfriend and Danielle's young daughter. The property was previously owned by Bradley and Connie's father, and before their father's death Bradley lived in the house with their father. After Bradley and Connie's father's death in 2006, Bradley moved into the converted barn and Connie and her children moved into the house. By the time of the murder, Kevin and Kurt were living in the barn with Bradley and their friend, Steven Ackles, who frequently stayed the night and was present the night of the crime.

4

Until June 2011, Kyle also lived in the barn with his brothers and uncle. Kyle regularly borrowed money from Connie and Bradley. He also abused prescription medication, and Connie testified Kyle stole money from her and Bradley in the past. Less than a month before the crime, Bradley suspected Kyle of stealing from him. As a result, Kyle left the family property to stay with Lamoureux and Inserra at Inserra's house.[3]

Bradley worked as a custodian for a nearby school district. Kyle knew Bradley did not have a bank account and that Bradley kept approximately $2,200 in pay he received at the end of each month in cash in his room in the barn. Kyle was also aware that Bradley stored antianxiety and pain prescription medications there. Bradley's room did not lock from the inside, so when he left he would lock the room with a padlock from the outside. Months before the crime, Kyle told Kurt he wanted to rob Bradley by waiting for Bradley to arrive home from work on his scooter and attack him with a bat. Ackles also heard Kyle say he was going to rob his uncle.

The prosecution's evidence is sparse about Kyle's relationship with Lamoureux and Inserra. At the time of trial, Lamoureux and Inserra had been dating approximately five years and living together for a few years. Spencer, who was nine years old and lived with Inserra part time in June 2011, knew Lamoureux as his father's girlfriend. Spencer

---

[3] The record is not clear whether Kyle left the family home on his own accord after Bradley accused Kyle of stealing from him, or whether Kyle was asked by Connie and Bradley to leave.

described Kyle as Lamoureux's friend and testified Kyle had been living on their couch in the two-bedroom home for a month or so at the time of Bradley's death.[4]

Around the first of July, Kyle and Lamoureux socialized at the house of a recent acquaintance, Raymond Amick. Amick's roommate, Anthony Alferez, was there and testified Kyle and Lamoureux were acting affectionately towards one another and that he thought Kyle and Lamoureux were a couple.[5] A day or two later, Kyle and Lamoureux returned to Amick's house in the morning. Amick was not home, but Alferez was. According to Alferez, Kyle asked him if he could stash something there and, in front of Lamoureux, unwrapped a beach towel to reveal a gun. Lamoureux did not express any surprise at seeing the gun. Alferez agreed to hide the gun and put it behind the clothes dryer.

On the evening of July 5, 2011, a day or two after Kyle and Lamoureux left the gun at Amick and Alferez's house, Lamoureux called Amick and told him that Kyle and Inserra were coming to retrieve the gun. Spencer overheard Lamoureux talking to Amick and asked her if he could go along with his dad and Kyle. Lamoureux told Spencer to ask his dad. Inserra agreed and sometime after dark Kyle, Inserra and Spencer drove in Inserra's truck to Amick's house.

Amick testified that once Kyle and Inserra arrived, he gave the gun to them and that they stayed at his house only minutes. Spencer recalled being at Amick's property

---

[4] Inserra and Lamoureux shared a bedroom and the other bedroom was occupied by Spencer.

[5] Amick and Alferez both testified under immunity agreements with the district attorney.

for over an hour.  Spencer did not go inside Amick's house but remembered watching a movie that was on inside from the front porch.  Alferez testified he was home watching a movie, but did not interact with Kyle, Inserra or Spencer.  Spencer testified that Amick gave the gun to Kyle and his dad, who let Spencer hold the sawed-off shotgun before putting the gun in the bed of his truck.  Spencer also told police that several nights before the crime while he was in bed, he heard a noise he thought was someone sawing the barrel off the gun.[6]

After leaving Amick's house, Kyle, Inserra and Spencer returned home to Lamoureux.  Spencer did not see either man bring the gun into the house.  Thereafter, and within hours of Lamoureux's call to Amick to say Kyle and Inserra were coming for the gun, Inserra drove Kyle to the Capen property in his truck and parked down the street.  That evening, Kevin, Kurt and Ackles were home in the converted barn.  Around 2:00 a.m. on July 6, 2011, Ackles went outside.  By this time Kevin had gone to bed while Kurt and Ackles stayed awake playing video games in Kurt's room.  While outside, Ackles heard a loud bang coming from inside the barn.

Ackles went back inside and asked Kurt what caused the noise.  Seconds later Ackles and Kurt heard another loud noise inside the barn.  Ackles also heard someone yell "Get the hell out."  Ackles and Kurt grabbed a hammer and shovel and walked toward where the noise came from.  They saw Kyle emerge from Bradley's room.  Kyle looked at Kurt and Ackles and said, "Shits going to hit the fan.  Go back inside and go to

---

[6]     Inserra told police the gun belonged to his father, and the gun was registered to Inserra's father.

bed. You never saw me." Kyle was holding a purple bag in one hand and a sawed-off shotgun in the other.

After the confrontation with Kyle, Kurt and Ackles went back to Kurt's room. They did not check on Bradley. Early the next morning, around 6:00 a.m., Danielle and her boyfriend, Justin Trentacosta, started morning chores and tending to the horses on the property. Ackles and Kurt eventually came to help. Trentacosta noticed Kurt looked ill and asked him what was wrong. Kurt told Trentacosta about the events in the early morning hours. The four then went to check on Bradley and found his door locked. Kurt broke the padlock with a sledgehammer and opened the door. They found Bradley lying on his back between his bed and dresser, with his head against the wall. Danielle called 911 and when the first police officer arrived, Bradley was pronounced dead. The coroner determined the cause of death was a gunshot wound to the head at contact range. Shotgun pellets were found in Bradley's head and mixed with brain matter around the body.

The same morning Bradley's body was discovered, Lamoureux took the murder weapon back to Amick's house. She and Alferez hid the gun in a lawnmower bag. That evening, Kyle, Lamoureux and others were hanging out at Inserra's house. Inserra was not home at the time but Spencer was, and Spencer overheard Kyle on the phone say he was going to prison. Later that night police arrested Kyle at the house. The following morning on July 7, 2011, Lamoureux called Amick and asked if Amick could come to them at Inserra's house and give Inserra a ride to work. Amick agreed. When he arrived, Lamoureux and Inserra told him about the shooting and that the gun used in the shooting

8

was at Amick's house.  When making this disclosure, Lamoureux told Amick that Kyle "had blown his uncle's head off."  Amick also testified that during this exchange Inserra said he "didn't know [Kyle] was going to do it" and that he was parked down the street.

Inserra and Lamoureux revealed their actual purpose in asking Amick to come to the house was to get Amick to drive them back to Amick's house to retrieve the gun. Amick refused because he thought the police were probably watching them.  The three agreed instead to call Alferez and tell him to get rid of the gun.  Alferez testified that he received a frantic call from Amick, who told him to get the gun out of the house because it was a murder weapon.  Alferez buried the gun with a plastic bag containing shotgun shells in a creek about a mile from his house.  Alferez later led investigators to the creek where the gun and the shells were retrieved.

Inserra and Lamoureux were arrested shortly thereafter.  When Inserra was brought in for questioning, he had $1,200 in $100 bills in his possession and two of the bills were bloodstained.  After Inserra was taken into custody, his brother, his brother's girlfriend and his stepfather went to Inserra's house to collect his possessions.  In the house, they found multiple boxes of ammunition out in the open and the barrel of the shotgun that was used in the shooting.  Inserra's brother testified at trial that they discovered the ammunition in the bathroom and that he found the shotgun barrel hidden in the eave of the patio covering.[7]

---

[7]    Spencer also told police he had seen ammunition for the shotgun on the dining room table and in his dad's bedroom.

In a bowl on top of a kitchen cupboard, they found a hand-drawn map of Bradley's living area in the modified barn. In addition to the map, written on the paper were the statements: "hides his shit so you will have to threaten and force him to kick it down" and "U can just walk right in." Also written on the paper were the quantities of prescription medication and their dollar value and the amount of cash Bradley "has now [$2,500]."[8] Shortly thereafter, Inserra's brother and stepfather called the police and turned this evidence over to authorities.

## II

### *Proceedings After the Prosecution's Case*

After the prosecution's case-in-chief, Lamoureux brought a motion for acquittal under section 1118.1, contending insufficient evidence had been presented to support the conspiracy and murder charges against her. The prosecutor opposed and the trial court denied the motion. Neither Kyle nor Lamoureux offered any affirmative evidence in support of their defense and none of the defendants took the stand. The case proceeded to closing arguments and Lamoureux's attorney argued that the prosecution failed to meet its burden of proof. He contended Lamoureux was guilty only of being an accessory after the fact (which she was not charged with) and not a conspirator or accomplice to felony murder.

After Kyle and Lamoureux's jury rendered its guilty verdicts, Lamoureux moved for a new trial under section 1181, subdivision (6). She asserted the jury's verdicts were

---

8       The writing on the map stated: "$720.00 ←180 Norc, " "[$]720.00 ← 120 perc," and "[$]360.00 ← 90 bars." No handwriting evidence was presented to show whose writing was on the paper.

contrary to the law because the evidence was insufficient to support a finding of guilt. The court denied the motion.  After judgment was entered against them, Kyle and Lamoureux timely appealed.

DISCUSSION

I

*Denial of Lamoureux's Motion To Sever Trial or Provide a Separate Jury*

Lamoureux first argues her convictions must be reversed because the denial of her pretrial motion to sever deprived her of her right to a fair trial and impartial jury.  We disagree.

A

Before the trial began Lamoureux brought a motion to be tried separately from Kyle and Inserra or, alternatively, for a separate jury.[9]  Without identifying any specific statement, she argued this relief was required because Kyle and Inserra made statements to police that were incriminating to themselves and Lamoureux.  Since neither codefendant intended to testify at trial, Lamoureux asserted that the introduction of those statements by the prosecution would constitute a violation of her constitutional right to confront and cross-examine witnesses against her.  Lamoureux also argued that several of the prosecution's witnesses would make statements concerning the dangerousness of Kyle and Inserra, and the introduction of this evidence would cause her irreparable prejudice.

---

[9]     Lamoureux also joined an earlier motion by Inserra to sever, which was denied without prejudice.

In response to Lamoureux's motion, the prosecution set forth testimony it intended to introduce, including Inserra's statement to Amick on July 7, 2011, that the shotgun at Amick's house had been used to kill Bradley and other testimony from Amick, Alferez and Spencer to support its claim that Lamoureux conspired with Kyle and Inserra to rob Bradley. The district attorney argued none of the testimony it intended to introduce posed a confrontation clause problem because the statements made were in furtherance of conspiracy or were not testimonial. The district attorney also argued severance was not warranted because Lamoureux's moving papers failed to identify any exculpatory testimony that she could offer in a separate trial that could not be offered in a joint trial. Finally, the district attorney argued granting Lamoureux's request would have "a traumatic effect on judicial administration" given the expected length and scope of the proceeding.

At oral argument on Lamoureux's motion, her attorney stated only "I believe that in a separate trial that both of these defendants [Kyle and Inserra] would testify on her behalf" and submitted on his brief. The trial court denied Lamoureux's motion, finding a single jury for Kyle and Lamoureux afforded Lamoureux fair process and the amount of time required to empanel a third jury was not justified. The trial court noted its reliance on *People v. Arceo* (2011) 195 Cal.App.4th 556 (*Arceo*) and concluded the hearsay statements the prosecution intended to introduce were admissible as statements made in furtherance of an ongoing conspiracy.

12

B

A motion to sever is governed by section 1098, which states: "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court orders separate trials. In ordering separate trials, the court in its discretion may order a separate trial as to one or more defendants, and a joint trial as to the others, or may order any number of the defendants to be tried at one trial, and any number of the others at different trials, or may order a separate trial for each defendant; provided, that where two or more persons can be jointly tried, the fact that separate accusatory pleadings were filed shall not prevent their joint trial."

By enacting section 1098, the Legislature expressed its clear preference for joint trials when available. (*People v. Cleveland* (2004) 32 Cal.4th 704, 725-726.) The trial court, however, retains discretion to order separate trials. (*People v. Morganti* (1996) 43 Cal.App.4th 643, 671.) A ruling on a motion for separate trials is reviewed under the abuse of discretion standard. (*Ibid.*) The trials of codefendants may be severed " 'in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony.' " (*People v. Avila* (2006) 38 Cal.4th 491, 574-575 (*Avila*), quoting *People v. Massie* (1967) 66 Cal.2d 899, 917.)

When ruling on a motion to sever, the court should consider: "(1) the cross-admissibility of the evidence in separate trials; (2) whether some of the charges are likely to unusually inflame the jury against the defendant; (3) whether a weak case has been

joined with a strong case or another weak case so that the total evidence may alter the outcome of some or all of the charges; and (4) whether one of the charges is a capital offense, or the joinder of the charges converts the matter into a capital case." (*People v. Mendoza* (2000) 24 Cal.4th 130, 161.) We determine whether a court has abused its discretion by looking at the facts at the time the motion was heard. (*People v. Pinholster* (1992) 1 Cal.4th 865, 932.) "A ruling that was correct when made will stand unless joinder cause[d] such ' " 'gross unfairness' " ' as to violate defendant's due process rights." (*People v. Carasi* (2008) 44 Cal.4th 1263, 1296.)

## C

Lamoureux argues a separate trial was necessary because the prosecution's case against Kyle was much stronger than its case against her. We reject this contention. As the Attorney General points out, Lamoureux's liability was premised on theories of conspiracy and aiding and abetting. Thus, the defendants in this case were charged with common crimes arising from common events presenting "a ' "classic case" ' for a joint trial." (*People v. Souza* (2012) 54 Cal.4th 90, 110.) Lamoureux does not set forth what evidence, if any, was presented to the jury that would have been excluded in a separate trial or from a separate jury. Lamoureux's case was not in the same posture as Inserra's case, which warranted separate juries so that inculpatory evidence admissible against Inserra (but not Kyle) would not be heard by Kyle's jury. Lamoureux has not shown the trial court abused its discretion by not allowing an exception in her case to the statutory preference for joint trials.

14

Lamoureux relies on *People v. Chambers* (1964) 231 Cal.App.2d 23 to assert she was unfairly prejudiced by a much stronger case against Kyle. We do not agree. Unlike Kyle, the appellant's codefendant in *Chambers* was charged with "separate and *unrelated* offenses" and the joint trial resulted in the "admission . . . of voluminous evidence of unrelated acts of brutality by [the codefendant], admissible only because she was on trial for offenses unrelated to that charged against [the appellant] . . . ." (*Id.* at pp. 27, 28, italics added.) Further, the trial in *Chambers* did not include any "evidence of joint or conspiratorial action" by the two defendants. (*Id.* at p. 26.) Lamoureux was not in an analogous position. Unlike the unrelated charges against the appellant's codefendant in *Chambers*, the charges against Lamoureux were the same as those charged against Kyle.[10]

We also reject Lamoureux's contention that the case against Inserra was stronger than the case against her, proving Lamoureux suffered undue prejudice by sharing a jury with Kyle. Whether there was more or less evidence against Inserra is not determinative of whether the trial court abused its discretion by not providing Lamoureux with a separate trial or jury. The evidence that was presented against Inserra, and not against Lamoureux and Kyle, is not before the court. Moreover, the outcome of Inserra's case

---

10    Lamoureux also cites *People v. Coffman and Marlow* (2004) 34 Cal.4th 1 and *People v. Keenan* (1988) 46 Cal.3d 478 in support of her argument that the prosecution's case against her was so weak that trying the case with Kyle was unduly prejudicial. In these cases, the reviewing courts affirmed the trial courts' denials of severance motions under circumstances involving defendants who were substantially involved in the alleged crimes with the codefendants. These cases do not show the trial court abused its discretion here. The fact that Lamoureux's involvement was less than Kyle's did not alone compel the trial to court grant her severance motion.

does not show what would have occurred had Lamoureux's trial been severed from Kyle's. Similarly, Inserra's acquittal in a subsequent trial was not before the trial court and thus is not relevant to this appeal.[11]

Finally, Lamoureux argues that Inserra's testimony would have exonerated her in a separate trial. In support of this contention, she points to Inserra's recorded interview with police on July 14, 2011, during which he stated "I don't think [Lamoureux] [¶] . . . [¶] really knew anything about [the planned robbery]." Because the interview transcript also contained admissions by Inserra implicating Kyle, it was excluded from Lamoureux and Kyle's jury to avoid violating Kyle's constitutional right to confront the witnesses against him. Lamoureux fails to address how the hearsay statement would have been admitted in a separate trial or before a separate jury. Lamoureux's trial attorney did not advance this testimony in either his severance motion or at the hearing on the motion. Rather, he stated generally he "believe[d] that in a separate trial that both [Kyle and Inserra] would testify on [Lamoureux's] behalf" and provided no explanation as to how this would be accomplished. Nothing in the record suggests that a separate trial or jury would have resulted in Inserra deciding to inculpate himself so as to testify in a manner exculpatory to Lamoureux, and/or that the prosecution would have granted immunity to Inserra for purposes of Lamoureux's separate trial or jury. Absent this, the cited item of evidence does not show the court abused its discretion in denying severance

---

11    We grant Lamoureux's request for judicial notice of the facts that Inserra's jury was unable to reach a verdict and the trial court's declaration of a mistrial, as well as her request for judicial notice of the minute order in Inserra's subsequent trial acquitting him of all charges. As discussed, this information does not alter the outcome of Lamoureux's appeal.

16

or that Lamoureux's fair trial rights were violated. (See *People v. Cummings* (1993) 4 Cal.4th 1233, 1286 & fn. 26.)

Lamoureux has not shown the trial court abused its discretion by denying her motion for a separate trial or a separate jury. For the same reasons, we also reject Lamoureux's contention that the joint trial was grossly unfair, depriving her of a fair trial or due process of law.

## II

*Sufficiency of the Evidence To Support Lamoureux's Felony Murder and Conspiracy Convictions*

Lamoureux contends the evidence was insufficient to support the jury's finding that she was guilty of the charged offenses. Because of that insufficiency, she argues that the trial court erred by denying her motion for judgment of acquittal at the close of the prosecution's case and that her convictions should be reversed.

## A

In reviewing the sufficiency of the evidence to support a jury's verdict finding a defendant guilty of a criminal offense, we apply the substantial evidence standard of review. (*People v. Johnson* (1980) 26 Cal.3d 557, 575-579.) "Under this standard, the court 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses *substantial evidence*—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] The focus of the substantial evidence test is on the *whole* record of evidence presented to the trier of fact, rather than on ' "isolated bits of evidence." ' " (*People v. Cuevas* (1995) 12 Cal.4th 252, 260-261.)

17

"The testimony of one witness, if believed, may be sufficient to prove any fact. (Evid. Code, § 411.)" (*People v. Rasmuson* (2006) 145 Cal.App.4th 1487, 1508.) "Further, 'the appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] This standard applies whether direct or circumstantial evidence is involved. 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' [Citation.]" (*People v. Catlin* (2001) 26 Cal.4th 81, 139; see *People v. Mobley* (1999) 72 Cal.App.4th 761, 788-789.)

"Whether a particular inference can be drawn from the evidence is question of law." (*People v. Austin* (1994) 23 Cal.App.4th 1596, 1604.) " 'An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action.' (Evid. Code, § 600, subd. (b).) However, '[a] reasonable inference . . . "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence." [Citation.]' " (*People v. Davis* (2013) 57 Cal.4th 353, 360.)

18

Section 1118.1 provides that "[i]n a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal." " 'The test applied by the trial court in ruling on a motion for acquittal is the same test applied by the appellate court in reviewing a conviction for sufficiency of the evidence, namely, to determine whether from the evidence then in the record, including reasonable inferences to be drawn therefrom, there is substantial evidence of the existence of every element of the offense charged.' " (*People v. Jones* (2013) 57 Cal.4th 899, 964.)

B

Lamoureux asserts there was insufficient evidence to support her convictions for felony murder and conspiracy to commit robbery because the prosecutor did not present any evidence of her knowledge of Kyle's plan to rob Bradley.

Section 182 prohibits a conspiracy by two or more people to "commit any crime." (*Id.*, subd. (a)(1).) " 'A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act "by one or more of the parties to such agreement" in furtherance of the conspiracy.' " (*People v. Johnson* (2013) 57 Cal.4th 250, 257.) " ' "[A]n overt act is an outward act done in pursuance of the crime and in manifestation

19

of an intent or design, looking toward the accomplishment of the crime." [Citations.]' " (*Id.* at p. 259.) "Once one of the conspirators has performed an overt act in furtherance of the agreement, 'the association becomes an active force, it is the agreement, not the overt act, which is punishable. Hence the overt act need not amount to a criminal attempt and it need not be criminal in itself.' " (*Ibid.*)

A person aids and abets the commission of a crime when he or she acts with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of encouraging or facilitating the commission of the crime, and his or her act or advice in some manner aids, promotes, encourages or instigates the commission of the crime. (*People v. Beeman* (1984) 35 Cal.3d 547, 560-561.) "Intent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense." (*People v. Pre* (2004) 117 Cal.App.4th 413, 420.) Robbery is the "taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.)

Although there was no direct evidence concerning Lamoureux's knowledge of and agreement with the plan to rob Bradley, there was sufficient circumstantial evidence to support the jury's finding that she knowingly and willingly participated in the robbery plan. The evidence showed that she appeared to be romantically linked with Kyle; a day or two before the robbery she accompanied Kyle to Amick's house and (expressing no surprise) witnessed Kyle's revelation of the gun and request that the gun be hidden; on the night of the crime she called Amick to tell him that Kyle and Inserra were coming to get the gun; upon their retrieval of the gun Kyle and Inserra rejoined her at their home; the

20

two men then left the home and Kyle committed the crime; the morning after the crime she brought the gun to Amick's residence and hid it; the following morning she summoned Amick to her home on a pretext; and she then told Amick that Kyle had shot the victim with the gun and discussed with Amick how to get rid of the gun. The evidence showed that Lamoureux was a participant in conversations concerning Kyle's and Inserra's activities. Before the crime she apprised Amick that the men were coming to get the gun, and after the crime she apprised Amick that Kyle had used the gun to commit the crime. Further, the evidence showed that there was physical evidence associated with the crime at the residence that Lamoureux shared with the men, including a map of the victim's residence and the sawed-off barrel of the gun used in the crime.

Considering all this evidence together, the jury could reasonably conclude that Lamoureux knew about and was willingly assisting Kyle in the plan to rob Bradley. The jury could deduce that she had a close personal connection with Kyle; she knew Kyle had a criminal intent when she witnessed his suspicious act of hiding a lethal weapon at someone else's house; and she shared Kyle's criminal intent given the combined circumstances of her lack of surprise at Kyle's suspect behavior of hiding the gun, her facilitation of Kyle's use of the weapon by calling Amick to tell him Kyle was coming to get the gun and her attempts to assist Kyle after the crime by taking steps to ensure the disposal of the gun. The jury could further infer that she was engaging in ongoing discussions with Kyle about his activities (including the robbery plan) because otherwise she would not have known to call Amick about Kyle's impending gun retrieval and the postcrime need to get rid of the weapon. Further, although there was no direct evidence

21

that she knew about the map or gun barrel found at her residence, the jury could conclude that she knowingly and willingly participated in the plan to rob the victim based on the totality of the circumstances showing that she shared the small residence with the two men, she had a close personal connection with them, her conduct and communications evinced an awareness of their activities, and, most significantly, both before and after the crime she engaged in significant, ongoing behavior tied to the robbery weapon. (See *People v. Campbell* (1994) 25 Cal.App.4th 402, 409 [" '[A]mong the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' "].)

Citing *People v. Em* (2009) 171 Cal.App.4th 964, Lamoureux argues that because she was not present at the scene of the crime and did not have a history of violence, the jury's conclusion that she was a conspirator is not supported by evidence. To be convicted of the conspiracy, however, it was not necessary that Lamoureux be present during the commission of the crime. Rather, the prosecution was required to show she agreed with her conspirators to rob Bradley, she intended Kyle or Inserra would "commit the robbery, and that one member of the conspiracy committed an overt act to accomplish the robbery." (*Id*. at p. 970, citing *People v. Williams* (2008) 161 Cal.App.4th 705, 710.) The evidence was sufficient to support these findings.

Lamoureux also contends there is a "gap in proof between [her] moving [Inserra]'s shotgun to Amick's home and facilitating its retrieval the next day when Amick wanted the gun removed because he declined to purchase it, and her participation in a robbery and burglary." She argues that gap could only be filled by impermissible speculation and

22

that her bringing the gun to Amick's house before the crime hindered, not helped, the plan to rob Bradley. We disagree.

The jury was not required to credit the alternative theory Lamoureux advanced for the movement of the gun to and from Amick's house, which was that Amick was considering purchasing the gun. There was conflicting testimony concerning Amick's interest in purchasing the gun. Amick did testify he was potentially interested in purchasing the weapon. However, Amick was not aware that Kyle and Lamoureux were going to bring the gun to his house, and he was not home when they arrived with the gun. Further, Amick testified he had not discussed buying a gun with any of the defendants before the gun arrived at his house. Alferez, Amick's roommate, testified that when Kyle and Lamoureux first brought the gun to the house, neither mentioned selling the gun to Amick. Rather, Kyle asked Alferez if they could use the house as a hiding place for the gun. Finally, Amick testified that when Lamoureux called him to say Kyle and Inserra were coming for the gun, he had not told any of the defendants he did not want to purchase it.[12]

Given the inconsistencies in Amick's testimony concerning his interest in buying the gun, it was reasonable for the jury to reject this alternative explanation for Lamoureux's movement of the murder weapon and find Lamoureux facilitated the retrieval of the gun on her own accord (or at the request of Kyle or Inserra). In sum, we conclude there was sufficient evidence of Lamoureux's knowledge of and participation in

---

[12] Amick is also a convicted felon and could not legally possess or purchase a firearm at the time of these events.

23

the crime to support her convictions for felony murder and conspiracy to commit robbery. Although the jury could have reached a contrary conclusion concerning Lamoureux's knowledge of and participation in the robbery plan, it is not our role to upset a jury verdict that is supported by the evidence and reasonable inferences drawn therefrom. (*People v. Shamblin* (2015) 236 Cal.App.4th 1, 9-10 [appellate court must accept logical inferences that the jury might have drawn from the evidence even if evidence could reasonably be reconciled with finding of innocence or lesser degree of crime].)

## III

### *Sufficiency of the Evidence Supporting the Special Circumstance Finding*

Lamoureux next contends the special circumstance conviction must be reversed because insufficient evidence supported the jury's findings that she had intent to kill or acted with reckless indifference to human life while acting as a major participant in the underlying felony. As with her claim of insufficient evidence with respect to the felony murder and conspiracy charges, Lamoureux argues that because insufficient evidence supported the jury's finding, the court erred by denying her motion for judgment of acquittal at the close of the prosecution's case.

### A

"We review a challenge to the sufficiency of the evidence to support a special circumstance finding as we review the sufficiency of the evidence to support a conviction." (*People v. Cole* (2004) 33 Cal.4th 1158, 1229.) "In reviewing a criminal conviction challenged as lacking evidentiary support, 'the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses

24

substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Hillhouse* (2002) 27 Cal.4th 469, 496.)  In addition to viewing the evidence in the light most favorable to the judgment, we also presume in favor of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence.  (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)

" 'All murder . . . which is committed in the perpetration of, or attempt to perpetrate [certain enumerated felonies including robbery and burglary] . . . is murder of the first degree.'  ( . . . § 189.)  The mental state required is simply the specific intent to commit the underlying felony [citation], since only those felonies that are inherently dangerous to life or pose a significant prospect of violence are enumerated in the statute. [Citations.]  'Once a person has embarked upon a course of conduct for one of the enumerated felonious purposes, he comes directly within a clear legislative warning—if a death results from his commission of that felony it will be first degree murder, regardless of the circumstances.' "  (*People v. Cavitt* (2004) 33 Cal.4th 187, 197 (*Cavitt*).)

"The purpose of the felony-murder rule is to deter those who commit the enumerated felonies from killing by holding them strictly responsible for any killing committed by a cofelon, whether intentional, negligent, or accidental, during the perpetration or attempted perpetration of the felony.  [Citation.]  'The Legislature has said in effect that this deterrent purpose outweighs the normal legislative policy of examining the individual state of mind of each person causing an unlawful killing to determine whether the killing was with or without malice, deliberate or accidental, and calibrating

25

our treatment of the person accordingly.  Once a person perpetrates or attempts to perpetrate one of the enumerated felonies, then in the judgment of the Legislature, he is no longer entitled to such fine judicial calibration, but will be deemed guilty of first degree murder for any homicide committed in the course thereof.' "  (*Cavitt, supra*, 33 Cal.4th at p. 197.)

While the Eighth Amendment to the United States Constitution does not prohibit the death penalty, "it does require that states offer guidance to sentencing bodies tasked with differentiating those for whom death is appropriate from those for whom it is not." (*People v. Banks* (2015) 61 Cal.4th 788, 797 (*Banks*), citing *Gregg v. Georgia* (1976) 428 U.S. 153, 187-189; *People v. Crittenden* (1994) 9 Cal.4th 83, 154.)  In California this guidance is provided through a two-step process codified by sections 190.2 and 190.3. First, the defendant's conduct must be among the crimes included in "a list of special circumstances . . . deemed sufficiently reprehensible to warrant possible punishment by death.  (§ 190.2; *People v. Bacigalupo* (1993) 6 Cal.4th 457, 467-468.)  If a sentencer finds one or more special circumstances true, the defendant becomes death eligible and must be sentenced to either death or life without the possibility of parole.  (§ 190.2, subd. (a).)  Second, the sentencer must consider potential statutory aggravating factors and weigh them against any mitigating factors to determine whether death or life imprisonment without parole is the appropriate punishment."  (*Banks*, at p. 797, citing § 190.3.)

Among the special circumstances enumerated in section 190.2 are murders "committed while the defendant was engaged in, or was an accomplice in, the

26

commission of" a robbery or burglary. (§ 190.2, subd. (a)(17)(A), (G).) Section 190.2, however, limits the imposition of both the death penalty and, as relevant here, a sentence of life without the possibility of parole, when the defendant is an accomplice to the felony and not the actual killer. In this circumstance the prosecution is required to " 'show that the [defendant] had intent to kill or acted with reckless indifference to human life while acting as a major participant in the underlying felony. (§ 190.2, subds. (c), (d).)' " (*People v. Hodgson* (2003) 111 Cal.App.4th 566, 578 (*Hodgson*).)

Before the Supreme Court's recent decision in *Banks*, little guidance existed on the contours of the limitation set forth in subdivisions (c) and (d) of section 190.2. *Banks*, however, provides clear direction on this limitation and leads necessarily to the reversal of the special circumstance finding against Lamoureux in this case.[13]

B

In *Banks*, the California Supreme Court reversed the application of the special circumstance finding against Lovie Troy Matthews, who acted as a getaway driver for three fellow gang members whose attempted robbery of a medical marijuana dispensary in Los Angeles resulted in the shooting death of the dispensary's security guard. (*Banks, supra*, 61 Cal.4th at p. 794.) The dispensary had significant security measures in place. The building had a metal security door providing access from the sidewalk and behind that door sat a security guard who verified patients' identification and physician's medical

---

[13]    Because *Banks* was decided during the pendency of this appeal, we requested supplemental briefing from the parties concerning the impact of the decision.

marijuana recommendation before escorting the patient through another locked door. (*Id.* at p. 795.) Surveillance cameras monitored this activity. (*Ibid.*)

Matthews waited in a car blocks away while his three armed confederates entered the first door and were escorted by the security guard past the second door where they "began tying up employees and searching the premises." (*Banks, supra*, 61 Cal.4th at p. 795.) Shots were fired and the three men fled. A witness outside the dispensary saw the security guard pushing the front door closed from the outside when one of the robbers reached around from the inside and shot the guard, who fell to the ground. The shooter exited the door and shot the guard again. (*Ibid.*) Global positioning system data on Matthews showed the getaway car on the block where the dispensary was located just before the crime, then at a location three blocks away for 45 minutes while the crime was occurring, and finally moving toward the dispensary and making a series of stops that aligned with the time Matthews picked up two of the three perpetrators in his car. (*Id.* at p. 796.)

In finding the special circumstance provision did not apply to the evidence presented against Matthews, the court emphasized that "Matthews was absent from the scene, sitting in a car and waiting" and that "[t]here was no evidence [Matthews] saw or heard the shooting, that he could have seen or heard the shooting, or that he had any immediate role in instigating it or could have prevented it." (*Banks, supra,* 61 Cal.4th at p. 805.) In reaching its conclusion, the *Banks* court analyzed the two United States Supreme Court cases, *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*) and *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*) that precipitated the adoption of section 190.2,

28

subdivision (d) by voter initiative in 1990. Although these federal cases concern the Eighth Amendment's limits on the imposition of the death penalty, the standards articulated in *Banks* "apply equally to cases like this one involving statutory eligibility under section 190.2[, subdivision ](d) for life imprisonment without parole."[14] (*Banks, supra*, 61 Cal.4th at p. 804.)

In determining whether the death penalty (and by statutory extension in California, a sentence of life without the possibility of parole) is properly imposed, *Tison* and *Enmund* require a sentencing body to "examine the defendant's *personal* role in the crimes leading to the victim's death and weigh the defendant's individual responsibility for the loss of life, not just his or her vicarious responsibility for the underlying crime." (*Banks, supra*, 61 Cal.4th at p. 801.) With respect to whether the defendant has the requisite intent, section 190.2, subdivision (d) looks "to whether a defendant has ' "knowingly engage[ed] in criminal activities known to carry a grave risk of death." ' [Citation.] The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Banks*, at p. 801.) Further, the defendant must " 'subjectively appreciate[] that [his] acts were likely to result in the taking of innocent life.' " (*Id.* at p. 802, quoting *Tison, supra*, 481 U.S. at p. 152.)

*Banks* holds that *Tison* and *Enmund* represent points on a continuum. Somewhere between "conduct less egregious than the [defendants in *Tison*] but more culpable than

_____

14    Like Lamoureux, Matthews was sentenced to life without the possibility of parole. (*Banks, supra*, 61 Cal.4th at p. 794.)

[the defendant in *Enmund*] lies the constitutional minimum for death eligibility." (*Banks, supra*, 61 Cal.4th at p. 802.) In *Tison*, the defendants were two brothers who planned and carried out the escape of two convicted murderers from prison, one of whom, their father, was "serving a life sentence for killing a guard in the course of a previous escape." (*Banks*, at p. 802.) A third brother was killed during the events of the escape. The three brothers brought a "cache of weapons to prison, arming both murderers," and held guards and visitors at gunpoint. (*Ibid.*) After the successful jailbreak, the five men flagged down an innocent family on the highway to steal their car. The men "robbed the family and held them at gunpoint while the two murderers deliberated whether the family should live or die, then [the defendants] stood by while" the escaped convicts shot all four members of the innocent family. (*Ibid.*, citing *Tison, supra*, 481 U.S. at p. 151.)

In contrast, the defendants in *Enmund* and *Banks* were getaway drivers in armed robberies who waited for their accomplices in nearby cars and were not present during the commission of the robberies that resulted in murder.[15] In distinguishing the Tison brothers from the defendant in *Enmund*, the United States "Supreme Court said: 'Far from merely sitting in a car away from the actual scene of the murders acting as the getaway driver to a robbery, [the Tison brothers were] actively involved in every element of the kidnapping-robbery and [were] physically present during the entire sequence of

---

[15] Like Matthews, Enmund waited in the car at the side of the road, about 200 yards from the home of the elderly couple his two accomplices intended to rob. The robbery resulted in a gunfight and the elderly victims were killed. (*Enmund, supra*, 458 U.S. at p. 784.) Enmund was convicted as an accomplice to the felony murders and sentenced to death. (*Id*. at p. 785.)

criminal activity culminating in the murder of the . . . family and subsequent flight.' " (*Banks, supra*, 61 Cal.4th at p. 802.)

The *Banks* opinion articulates several factors that play a role in determining whether section 190.2, subdivision (d) applies: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used? No one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major' [citations]." (*Banks, supra*, 61 Cal.4th at p. 803.)

The court also rejected the Attorney General's assertion that " 'participation in planning with the intent of facilitating the commission of the crime, or participating in conduct integral to or for the purpose of facilitating the commission of the crime, constitutes major participation[,]' " noting such a rule would "sweep in essentially every felony murderer" in violation of the requirement that "culpability be considered individually." (*Banks, supra*, 61 Cal.4th at p. 803.) As discussed herein, there was sufficient evidence of Lamoureux's knowledge and involvement in the plan to rob

31

Bradley to support the jury's finding that Lamoureux conspired to rob and aided and abetted the robbery of Bradley. As *Banks* makes clear, however, this does not lead inevitably to the conclusion that the evidence was also sufficient to support the special circumstance finding.

C

Application of the factors set forth in *Banks* shows that there was not sufficient evidence to support the jury's findings that Lamoureux acted with reckless indifference to human life or that she was a major participant in the crime. Most importantly, there was no evidence that Lamoureux was involved in the actual execution of the robbery. Indeed, it was not disputed that she remained at home during the commission of the crime. Lamoureux, therefore, was not "in a position to facilitate or prevent the actual murder" (*Banks, supra*, 61 Cal.4th at p. 803) and "had no opportunity to dissuade the actual killer, nor [provide] aid to the victim[], and thus [had] no opportunity to prevent the loss of life." (*Id.* at p. 803, fn. 5.) There was also no evidence that Kyle had committed violent acts in the past to put Lamoureux on notice of a particular risk of death that the armed robbery posed.

On the continuum described in *Banks*, Lamoureux's conduct was not "more culpable than Earl Enmund's" and, therefore, not above the "constitutional minimum" required for application of the special circumstance provision. (*Banks, supra*, 61 Cal.4th at p. 802.) The Supreme Court's reversal of the special circumstance finding in *Banks* involved evidence of participation by Matthews in the crime that was at best similar, and more likely greater, than Lamoureux's participation in the robbery here. For instance,

32

Matthews was "the one that gets everyone to the [robbery's] location, waits around, and his job was to get everyone to safety afterwards." (*Id*. at p. 806.) Lamoureux, in contrast, waited at home while the crime was committed, and had no ability to influence the events that transpired during the commission of the crime.[16]

Appellate cases predating *Banks* that address the application of the special circumstance provision to accomplices who did not pull the trigger also support our conclusion that Lamoureux was not a "major participant" in the crime. In all of the cases cited by the parties, there was evidence that the defendants were present at the scene of the robbery and were in some way *physical* participants in the *commission* of the robberies that ultimately resulted in the death of the victim. (See *People v. Lopez* (2011) 198 Cal.App.4th 1106, 1114, 1115-1118 [accomplice lured victim into alley to "jack" him, knew the shooter had a gun and was with him when he picked it up, then waited around the corner while the robbery took place]; *Hodgson, supra*, 111 Cal.App.4th at pp. 576-577 [defendant was present while the direct killer shot the carjacking victim twice through the window of her car immediately after she drove into her underground parking garage; evidence showed defendant yelled to the killer that the electric gate to the

---

16     As in *Banks*, the Attorney General asserts that because Lamoureux knew Kyle and Inserra were armed, she possessed a reckless indifference to human life. *Banks*, however, rejects the notion that the defendant's knowledge that his accomplices are armed, in and of itself, establishes a reckless indifference to human life. (*Banks, supra*, 61 Cal.4th at p. 809.) Further, despite the Attorney General's assertion to the contrary, the evidence of Lamoureux's knowledge that Kyle intended to use force to steal Bradley's money and medication was no greater than that presented in *Banks*, which involved a plan to rob a marijuana dispensary with significant security measures in place, including a metal security door and an armed security guard. (*Id*. at p. 795.) Certainly these measures showed that Matthews knew his confederates might use force to rob the dispensary.

garage was closing and held the gate open so the killer could escape]; *People v. Proby* (1998) 60 Cal.App.4th 922, 929 ["[D]efendant and [accomplice] were both armed robbers actively participating in the execution of the . . . robbery" and defendant admitted to police he saw the " 'pus' oozing out of [the victim's] head but made no attempt to assist or determine if the victim was still alive. Instead, defendant and [accomplice] went to the safe, took the money and left."]; *People v. Mora* (1995) 39 Cal.App.4th 607, 617 [defendant helped plan a nighttime armed invasion, gave his accomplice a rifle, and personally carried the loot, leaving one victim to die and threatening another]; *People v. Bustos* (1994) 23 Cal.App.4th 1747, 1754 [defendant was involved in planning the robbery, knew another codefendant had a knife, went into the restroom and struggled with the victim who was stabbed, and "fled together with his accomplices and the robbery loot, leaving the victim to die"].)

Given this landscape, we conclude Lamoureux was not eligible for the imposition of a life sentence without the possibility of parole under section 190.2. Retrial of this allegation is barred and on remand the trial court is directed to resentence Lamoureux on the remaining convictions.[17]

IV

*Denial of Motion for New Trial*

Lamoureux next contends the trial court erred by denying her motion for a new trial under section 1181. She argues the court failed to independently weigh the evidence

---

[17] In light of this decision, Lamoureux's claim that imposition of the sentence of life without the possibility of parole constituted cruel and unusual punishment under the federal Eighth Amendment is moot.

34

to reach its own conclusion and, even if the court applied the correct standard, it abused its discretion by denying her motion.

## A

The court may grant a motion for new trial when the verdict or finding is contrary to law or evidence. (§ 1181, subd. (6).) "The court extends no evidentiary deference in ruling on a section 1181[, subdivision ](6) motion for new trial. Instead, it independently examines all the evidence to determine whether it is sufficient to prove each required element beyond a reasonable doubt *to the judge*, who sits, in effect, as a '13th juror.' " (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 133.) If the court is not convinced the charges have been proven beyond a reasonable doubt, the court may rule the jury's verdict is contrary to the evidence and grant the motion for a new trial. (*Ibid.*)

The trial court has broad discretion when ruling on a motion for a new trial. The reviewing court will not disturb the trial court's ruling " 'absent a manifest and unmistakable abuse of that discretion.' " (*People v. Lewis* (2001) 26 Cal.4th 334, 364, quoting *People v. Hayes* (1999) 21 Cal.4th 1211, 1260-1261.) We conclude the trial court did not apply the wrong standard to Lamoureux's motion and its denial of the motion, with respect to her convictions for felony murder and conspiracy to commit robbery, did not constitute an abuse of discretion.

## B

In her motion for a new trial, Lamoureux argued there was insufficient evidence as a matter of law to sustain the jury's verdict. The prosecution opposed the motion and at the hearing the parties submitted on their briefs. The court then ruled, stating: "The

35

jury's verdict is rationally based on the evidence. There's no reason to usurp the decision made by the jury. The evidence established that there was clear preparation in this process; that Ms. Lamoureux knew of [Kyle]'s intent as to the decedent in this event. There is contemporaneous conduct at the time of the event to show her responsibility, and then there is sufficient conduct afterwards that would be . . . consistent with the preplanning stages of the event. [¶] So, as far as I'm concerned, the judgment of the jury is appropriate, and the motion for new trial is denied."

Lamoureux now asserts the court's statements indicate it "believed it had to determine whether sufficient evidence supported the verdicts." We disagree. The trial court is presumed to know and apply the correct law in the exercise of its duties. (*People v. Nance* (1991) 1 Cal.App.4th 1453, 1456.) In this case the correct standard was set forth in Lamoureux's motion and the prosecution's opposition, which the court stated it had reviewed and considered. The trial court's comments show only that the court agreed with the jury's findings, not that it applied the incorrect standard in ruling on the motion. (See *People v. Davis* (1995) 10 Cal.4th 463, 524 [Trial court's statement that it felt " 'there was sufficient evidence to support the verdicts' " did not demonstrate the court applied an incorrect standard to appellant's motion under § 1181, subd. (6).].)

We also reject Lamoureux's alternative assertion that, even if the court applied the correct standard, the trial court's denial of her motion constituted an abuse of discretion. As discussed in section II with respect to Lamoureux's convictions for felony murder and conspiracy to commit robbery, sufficient evidence supported the jury's guilty verdict. The court's denial of the motion was not, therefore, an abuse of discretion.

36

V

*Fees Imposed Against Lamoureux*

Lamoureux challenges the two fines assessed against her: A $560 restitution fine under section 1202.4, subdivision (b) and a $52.60 crime prevention fine under section 1202.5. The Attorney General concedes the $52.60 crime prevention fee is inapplicable and should be stricken. Section 1202.5 applies only if the defendant is convicted of one or more of certain enumerated offenses, none of which were charged against Lamoureux. On remand, the court is directed to modify the abstract of judgment to strike the $52.60 imposed under section 1202.5.

Section 1202.4, subdivision (b) states "[i]n every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine . . . . [¶] (1) The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense. If the person is convicted of a felony, the fine shall not be less than two hundred forty dollars ($240) starting on January 1, 2012, two hundred eighty dollars ($280) starting on January 1, 2013, and three hundred dollars ($300) starting on January 1, 2014, and not more than ten thousand dollars ($10,000) . . . . [¶] (2) In setting a felony restitution fine, the court may determine the amount of the fine as the product of the minimum fine pursuant to paragraph (1) multiplied by the number of years of imprisonment the defendant is ordered to serve, multiplied by the number of felony counts of which the defendant is convicted."

Prior to an amendment that became effective on January 1, 2012, the minimum restitution fine was $200. (§ 1202.4, as amended by Stats. 2011, ch. 358, § 1.)

Lamoureux asserts the trial court erroneously imposed the minimum $280 fine that was in effect at the time of sentencing (multiplied by two, the number of convicted offenses), rather than the minimum fine applicable in this case. Based on this inference, Lamoureux argues the court applied the statute in a constitutionally void ex post facto manner. The Attorney General responds that the fine was permissible because $200 is only a minimum, and there is no indication in the record that the trial court intended to impose only the minimum fine.

"A trial court is required to use 'a rational method' in computing restitution." (*People v. Harvest* (2000) 84 Cal.App.4th 641, 653.) The record is silent as to the rationale the trial court used to set the fine. The fine, however, is conspicuously equal to the inapplicable minimum fine in effect at the time of sentencing multiplied by the number of Lamoureux's convictions. On remand the trial court is directed to modify the restitution fine in accordance with the applicable statutory minimum if appropriate, but the court is not precluded from setting the fine at the greater amount previously imposed so long as it does so using a rational method of computation.

VI

*Admission of Extrajudicial Statements of Lamoureux and Inserra Against Kyle*

Kyle's first contention on appeal is that the trial court erred by allowing Amick to testify (1) that Lamoureux told Amick "Kyle had blown his uncle's head off" and (2) that Inserra told Amick "I didn't know [Kyle] was going to do it. I parked down the street." Kyle contends the trial court admitted these statements in "flagrant violation of the rule

38

promulgated in *People v. Aranda* (1965) 63 Cal.2d. 518" (*Aranda*) and that even if the statements were not precluded by *Aranda*, they were inadmissible hearsay.

A

Kyle's arguments concern Amick's trial testimony about the conversation he had with Lamoureux and Inserra when he arrived at their house the morning after Kyle's arrest. The prosecutor asked Amick "What does [Lamoureux] tell you about the shotgun that morning that you [came] to give Ian a ride to work?" Amick responded: "That Kyle had blown his uncle's head off." Kyle's attorney objected on the grounds of lack of foundation and speculation and the court overruled the objection. The prosecutor then asked if Inserra said anything about the gun during this conversation. Amick responded that Inserra said, "I didn't know he was going to do it. I parked down the street." No objection was made.

Under the *Aranda-Bruton* rule, the prosecution cannot introduce out-of-court statements of a codefendant that inculpate a nondeclarant defendant if those statements would not be admissible against the nondeclarant defendant in a severed trial. (*People v. Fletcher* (1996) 13 Cal.4th 451, 455; *People v. Morales* (1968) 263 Cal.App.2d 368, 374.) This rule applies even if the statements are admissible against the declarant codefendant. (*Fletcher*, at p. 455.) The rationale for the rule is that even with a cautionary instruction the jury cannot reasonably be expected to disregard the declarant defendant's statement in determining the guilt or innocence of the nondeclarant defendant, resulting in a violation of the nondeclarant defendant's right to confront witnesses against him. (*Ibid.*; *People v. Brawley* (1969) 1 Cal.3d 277, 286.) For

39

example, in this case, the *Aranda-Bruton* rule resulted in separate juries for Kyle and Inserra so that Inserra's statements to police that incriminated both Inserra and Kyle could be excluded from Kyle's jury.

A nontestifying defendant's statement that is *not testimonial*, however, does not implicate the confrontation clause concerns embodied by the *Aranda-Bruton* rule. (*Arceo, supra*, 195 Cal.App.4th at pp. 571-572.) If the statement is not testimonial, "the issue is simply whether the statement is admissible under state law as an exception to the hearsay rule." (*People v. Garcia* (2008) 168 Cal.App.4th 261, 291; see *People v. Gutierrez* (2009) 45 Cal.4th 789, 812 (*Gutierrez*) ["Only the admission of testimonial hearsay statements violates the confrontation clause—unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant."].)

Although no precise definition of what "constitutes a 'testimonial' statement" exists, the United States Supreme Court has stated that "at a minimum, testimonial statements include 'prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and . . . police interrogations."[18] (*Gutierrez, supra*, 45 Cal.4th at p. 812.) Further, the court has "explained that the confrontation clause addressed the specific concern of '[a]n accuser who makes a formal statement to government officers' because that person 'bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.' " (*Id.* at pp. 812-813, quoting *Crawford v. Washington* (2004) 541 U.S. 36, 51.)

---

[18]     For example, Inserra's interview with police.

The two statements at issue here were made at the defendants' residence, privately, by two coconspirators (Inserra and Lamoureux) to a third party (Amick). Kyle concedes these statements are not testimonial. He argues, however, that California law as announced in *Aranda* nevertheless precludes introduction of Inserra's and Lamoureux's statements to Amick.[19] We disagree. The rule announced by the California Supreme Court in *Aranda*, which was decided before *Bruton*, stemmed directly from the confrontation clause concerns that later resulted in the United States Supreme Court mandating the same limitation in *Bruton*. (See *Aranda, supra*, 63 Cal.2d at pp. 529-530 ["The grave constitutional doubts [referring to the defendant's constitutional right of confrontation] engendered by our present practice of permitting joint trials when the confession of one defendant implicates codefendants has prompted our reconsideration of this practice."].)

In support of his assertion that *Aranda* precludes introduction of the nontestimonial statements here, Kyle relies on *People v. Hajek and Vo* (2014) 58 Cal.4th 1144. *Hajek*, however, did not address whether a nontestimonial statement by a nontestifying defendant implicating the nondeclarant defendant must be excluded.

---

19    The *Aranda* court held that "[w]hen the prosecution proposes to introduce into evidence an extrajudicial statement of one defendant that implicates a codefendant, the trial court must adopt one of the following procedures: (1) It can permit a joint trial if all parts of the extrajudicial statements implicating any codefendants can be and are effectively deleted without prejudice to the declarant. . . . (2) It can grant a severance of trials if the prosecution insists that it must use the extrajudicial statements and it appears that effective deletions cannot be made. (3) If the prosecution has successfully resisted a motion for severance and thereafter offers an extrajudicial statement implicating a codefendant, the trial court must exclude it if effective deletions are not possible." (*Aranda, supra*, 63 Cal.2d at pp. 530-531, fn. omitted.)

Rather, in *Hajek*, the California Supreme Court concluded that the codefendant's nontestimonial statements to a third party did not implicate a codefendant. (*Id.* at pp. 1203-1204.) The court did not address whether the statement was testimonial and within the purview of *Aranda-Bruton* and Kyle's reliance on *Hajek* is misplaced. The nontestimonial statements at issue here do not implicate the confrontation clause problems addressed by the *Aranda-Bruton* rule and the trial court's failure to exclude them on this basis was not error.

B

Kyle next argues that even if the admission of the statements did not violate his rights under *Aranda*, they were inadmissible hearsay and their admission unfairly undermined his defense. An appellate court may reverse a judgment on the ground of erroneous inclusion of evidence only if the error resulted in a "miscarriage of justice." (Cal. Const., art. VI, § 13; Evid. Code, § 354.) In other words, reversal is warranted only if "the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

Even assuming the statements at issue were admitted in error, there was no reasonable probability Kyle would have escaped a conviction if the testimony was excluded. The evidence of Kyle's guilt was overwhelming. Connie testified Kyle had previously stolen from her and Bradley. His brother Kurt and Ackles both testified Kyle told them in the months before the crime he wanted to rob Bradley. The night after the

42

crime, Spencer overheard Kyle tell someone he was going to prison. Most damaging, Kurt and Ackles both saw Kyle emerge from Bradley's room the night of the murder with the shotgun in his hand, and Kyle told the two young men to go back to bed and that he was never there. In light of this evidence there was no reasonable probability that the exclusion of statements by Lamoureux ("Kyle had blown his uncle's head off") and Inserra ("I didn't know he was going to do it . . . I parked down the street") would have changed the outcome of the trial. Any error in the admission of these statements was harmless.[20]

## VII

### *Exclusion of Character Evidence*

Kyle argues the trial court erred by sustaining the prosecutor's relevance objection to his counsel's question to Connie "would it have surprised you to find out that Kyle would take a weapon, put it to Bradley's head, and pull the trigger?" Kyle asserts the testimony his counsel sought to elicit from Connie was relevant character evidence under Evidence Code section 1102, which showed he was a loving and devoted nephew. He further contends that exclusion of Connie's response to this question was a violation of

---

[20] We also reject Kyle's assertion that the court erred by failing to sua sponte instruct the jury on section 1111 with respect to Inserra's and Lamoureux's statements to Amick. Section 1111 provides that a "conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." Here, even if the court erred by failing to give such an instruction substantial corroborating evidence rendered any such error harmless. (*Avila, supra*, 38 Cal.4th at p. 562 ["A trial court's failure to instruct on accomplice liability under [§] 1111 is harmless if there is 'sufficient corroborating evidence in the record.' "].) Further, the court did give the instruction with respect to Amick and Alferez.

43

his constitutional right to present his defense that it was not within his character to commit the crime.

We review a trial court's evidentiary rulings for abuse of discretion. (*People v. Vieira* (2005) 35 Cal.4th 264, 292.) If the court's ruling erroneously excluded some evidence relevant to the defense but did not completely deprive the defendant of an opportunity to present a defense, we apply the state law standard for error, inquiring whether there is a reasonable probability the outcome would have been more favorable to the defendant absent the error. (*People v. Boyette* (2002) 29 Cal.4th 381, 428; *People v. Espinoza* (2002) 95 Cal.App.4th 1287, 1317.)

Although the court sustained this one relevance objection, Kyle's counsel was permitted to examine Connie at length about Kyle's relationship with Bradley. She testified Kyle and Bradley "loved each other dearly," that she witnessed the affection between them, and that "Kyle probably spent at least as much time" with Bradley as he had with his father. Kyle's assertion he was prevented from presenting evidence of his love for his uncle as part of his defense is meritless. In addition, whether Connie would be surprised to learn Kyle shot his uncle at close range, in essence whether she believed Kyle was guilty of the crime, was not relevant evidence to Kyle's character trait of loving his uncle. We find no abuse of discretion in the trial court's exclusion of this testimony.

DISPOSITION

As to Lamoureux, we order the judgment and abstract of judgment modified to strike Lamoureux's special circumstance conviction and to strike the $52.60 crime prevention fee imposed under section 1202.5. On remand the trial court is directed to

44

resentence Lamoureux on the remaining convictions and, if appropriate, to modify the restitution fee imposed against Lamoureux under section 1202.4, subdivision (b) consistent with this opinion.  The judgment is affirmed in all other respects.


HALLER, Acting P. J.

WE CONCUR:


McINTYRE, J.


AARON, J.